**Complaint Adjudication Office**
*950 Pennsylvania Ave, NW*
*Patrick Henry Building, Suite 4810*
*Washington, DC 20530*

Register No. 50807-037
DJ 187-3-4468

Mr. John TC Yeh
c/o Deborah Patkin, Esq.
National Association of the Deaf
8630 Fenton St., Suite 820
Silver Spring, MD 20910
debra.patkin@nad.org

Erin Odell, Attorney Advisor                    **FEB 0 5 2018**
Federal Bureau of Prisons
USP Lewisburg
2400 Robert Miller Drive
Lewisburg, PA 17837
eodell@bop.gov


Dear Parties:

Enclosed is the Department of Justice decision in the §504
Complaint filed by inmate John TC Yeh.  This decision is being
issued pursuant to the authority provided in 28 CFR 39.170.

                    Sincerely,


                    Robert K. Abraham
                    Acting Complaint Adjudication Officer

P.'S EXHIBIT A - Page 1



Complaint Adjudication Office

Register No. 50807-037
DJ 187-3-4468

*950 Pennsylvania Ave. NW*
*Patrick Henry Building, Suite 5300*
*Washington, DC 20530*

DEPARTMENT OF JUSTICE FINAL DECISION

FEB 0 5 2018

in the case of

## John TC Yeh v. Federal Bureau of Prisons

On September 24, 2015, John TC Yeh, complainant, an inmate
housed in the Schuylkill Federal Correctional Institution (FCI
Schuylkill) filed a complaint under Section 504 of the
Rehabilitation Act, 29 U.S.C. 704, 28 CFR 39.130(a) and 28
C.F.R. 39.160. In the complaint, complainant charged that
officials at FCI Schuylkill discriminated against him on the
basis of his disability (hearing impairment) when they failed to
provide him with hearing devices and assistance that would
provide him with opportunities to participate in and benefit
from programs and services at the institution that are equal to
those provided to inmates without a hearing impairment.

The complaint was accepted and complainant and the Federal
Bureau of Prisons (BOP) went through the initial steps in the
administrative process for such complaints (see 28 CFR Part 39)
ending with a Letter of Findings by BOP EEO Officer Mina Raskin.
Subsequently, and consistent with the administrative procedures
set forth at 28 CFR Part 39, complainant requested a hearing
before an Administrative Law Judge. An administrative hearing
was conducted between late January and early February, 2017. On
April 10, 2017 Administrative Law Judge (ALJ) John Mulrooney II,
issued his recommended decision in the case.

The recommended decision, which runs to 91 pages, contains
a thorough and detailed statement of facts that are adopted here
except in those instances where this decision specifically
states otherwise. What follows is a summary of the essential
facts leading to the issues under consideration and then an
analysis of the three issues identified by the ALJ.

Complainant, an inmate at FCI Schuylkill, is a profoundly
deaf individual and has been from birth. Complainant, who was
born in Taiwan, came to this country in the 1960s, when he was
about 16. Complainant stated that he has always been deaf and
that his first language was Taiwanese sign language and that he

also learned to read and write Chinese.   After moving to this
country, complainant learned American Sign Language (ASL) and
English.   After high school, complainant obtained a Bachelor's
degree in mathematics from Gallaudet University in 1971 and a
Master's degree from the University of Maryland in 1973 in
computer science and information systems.   Successful completion
of coursework and academic requirements required complainant to
take core classes that were taught and tested in English, both
at Gallaudet and at the University of Maryland.   After earning
his degrees, complainant worked for 6 years as a computer
programmer and then started a company, Integrated Microcomputer
Systems (IMS), where he held the position of IMS co-president
for eighteen years.   Complainant sold the company and began a
new one, Viable Technologies, Inc., which provided services in
"real time captioning" for deaf students at universities as well
as voice recognition technology.   Nine years later, complainant
began a third company, Viable Communications, which provided
Video Relay Services (VRS) technology.   VRS is a
telecommunication service which is administered and monitored by
the Federal Communications Commission (FCC) for use by the
hearing impaired.   During his ten plus years as President of
Viable Technologies and during his (concurrent) time as
President of Viable Communications, complainant communicated
with peers, employees and others using ASL and written English
and also relied on ASL Interpreters for supplemental assistance.

In 2009, complainant was charged with conspiracy to commit
mail fraud for fraudulently billing the FCC for VRS services
provided by his company, Viable Communications.   Complainant was
convicted of conspiracy to commit mail fraud and sentenced to
prison along with restitution.   Complainant began serving his
prison sentence at FCI Schuylkill on January 30, 2012 and
expects to be released, after accounting for "good conduct"
time, on October 14, 2019.   At the start of his term,
complainant was paired with his brother, Joseph Yeh (Joseph),
who was also at FCI Schuylkill after being convicted for a
similar criminal violation rising from the same events as in
complainant's conviction.   The record indicates that Joseph, who
is not hearing impaired and is very adept at ASL, was at FCI
Schuylkill from January, 2012 until he was released from prison
in August, 2015.   During this 40-month period, complainant
relied heavily on Joseph to communicate with the corrections
staff, with fellow inmates, and with facilitators for BOP
programs and services including medical services.

These are the background facts leading to the
discrimination claims in this case.   Complainant claimed that

2

FCI Schuylkill officials discriminated against him on the basis
of his hearing impairment when they: 1) failed to provide him
with an ASL interpreter so that he could fully participate in
educational classes, meetings, and medical appointments, 2)
failed to install and implement appropriate devices that would
fully alert him to ongoing emergencies at the institution, and
3) failed to provide him with videophone access so that he could
communicate his family and friends.

According to complainant, the failure of FCI Schuylkill
officials to provide him with appropriate devices and services
while housed at the institution is disability discrimination
that violates Section 504 of the Rehabilitation Act (§504) and
implementing DOJ regulations. §504 states that discrimination
is established when the record shows that:

    1) Complainant is disabled within the meaning of the
    Rehabilitation Act; 2) he is otherwise qualified to
    participate in the program and activity at issue; 3) he was
    excluded from, denied the benefit of, or subject to
    discrimination under a program or activity solely on the
    basis of his disability; and 4) the program or activity is
    carried out by a federal executive agency or with federal
    funds.

Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C.
Cir. 2008). The parties agree that the facts in the record
establish three of the four elements. Complainant, with his
profound hearing impairment, is disabled as defined by the
statute, he is "otherwise qualified" to participate in a full
range of programs and activities at FCI Schuylkill, and FCI
Schuylkill is a "program" run by the Department of Justice and
thereby governed by the anti-discrimination standards of §504.
The only element that does require resolution is whether
complainant was excluded from or denied participation in
programs or activities solely on the basis of his disability.[1]

Courts have explained that the third statutory element,
"excluded from or denied participation in programs or activities

---

[1] / Complainant argued that because courts have found claims and defenses under §504 of the Rehabilitation Act
and Title II of the Americans with Disabilities Act (ADA) to be nearly identical, a proper assessment of
complainant's claims require consideration of not just §504 but also Title II of the ADA. As noted by the ALJ (see
footnote 158 of ALJ Recommended Decision, p. 60), Title II of the ADA does not apply to the federal government,
and a review of several court decisions which have addressed the issue confirms the ALJ's conclusion. There is,
therefore, no basis for assessing complainant's complaint under the standards of Title II of ADA. This conclusion
applies not only to complainant's specific disability claims against BOP but also to his more general claim (that is
derived from a reading of Title II of ADA) that BOP is liable for not conducting an "ex parte assessment" of his
disability at the time he was admitted to the institution.

solely on the basis of his disability", is met when the evidence
shows that the person with disability was not provided devices
or assistance that would give him the same opportunity as other
others in the program to participate.   Jarvis v. Potter, 500
F.3d 1113, 1120-1121 (10th Cir. 2007); 28 CFR 39.130.  Applying
this standard here, the record must establish that complainant,
a hearing impaired individual, was not provided the aids and
assistance that would permit him an equal opportunity to
participate in FCI Schuylkill's programs and activities.   If the
four §504 elements are established, BOP may avoid liability if
it can establish that the aids and assistance complainant seeks
will fundamentally alter the program or activity at issue or
place an undue financial or administrative burden on the BOP.
28 CFR 39.160(d).

A. ASL Interpreters

     Complainant's first claim of §504 discrimination is that
FCI Schuylkill, by denying him the assistance of ASL
Interpreters, made it very difficult, and sometimes impossible
for him to participate in institution programs and meetings.

     A proper assessment of this issue begins with evidence
indicating that complainant did make initial requests for ASL
interpreter assistance at the start of his term in January,
2012.  In these early months, institution officials often
ignored complainant's requests or claimed that they were
attempting to obtain the services of an ASL interpreter.  But
significantly, complainant never pressed the issue for several
years because he could depend on his brother Joseph.  Joseph,
who entered FCI Schuylkill at the same time as complainant, was
not hearing-impaired and was very proficient at ASL.  While at
Schuylkill, Joseph was a loyal and conscientious brother who
willingly accompanied complainant to large, institution-wide
meetings, therapy sessions, inmate and educational programs, and
other events where complainant needed the assistance of an ASL
interpreter to understand the information being conveyed.  Such
circumstances continued without serious complaint from
complainant until, in August, 2015, Joseph was released from
prison.

     From that point, complainant began to experience serious
difficulties in understanding information and following
conversations in a variety of institutional settings.  At this
point, complainant became insistent about needing an ASL
interpreter.  The record establishes that FCI Schuylkill
officials attempted to make arrangements for an ASL interpreter,

4

but ran into difficulties on account of factors such as the
rather isolated location of the institution and the need for ASL
contractors to pass background security checks.  The record
indicates that FCI Schuylkill officials did secure an ASL
interpreter for an August 30, 2015 staff meeting.  At the August
30 meeting, FCI Schuylkill officials began the process of
establishing a workable ASL interpreter assistance program.
They asked complainant to identify already scheduled courses
that he was interested in, and also asked complainant to
routinely provide a two week notice for ASL interpreters so that
they could make proper and timely arrangements.  At the same
meeting, institution officials reassured complainant that if an
interpreter was unavailable for a class or session, efforts
would be made to reschedule the program.  The record indicates
that subsequent to that meeting, ASL interpreters were made
available for meetings with complainant in October 14, 2015 and
on other select occasions.  But as of the ALJ hearing,
complainant indicated that there were times and occasions when
he did not have access to the services of an ASL interpreter.

    The ALJ reviewed these facts and reached a proper, well
supported conclusion that, given present circumstances at FCI
Schuylkill, complainant must be provided with the services of an
ASL interpreter when significant information and instruction was
being provided to him.  The ALJ properly focused on the events
that took place after Joseph was released from the institution
in August, 2015.  The ALJ reasoned that for the three years
prior, while complainant had made initial requests for an ASL
interpreter, Joseph's effective and diligent assistance,
provided voluntarily, undercut any claim for an interpreter.
But, as the ALJ correctly observed, after the departure of
Joseph from FCI Schuylkill in mid-2015, complainant faced many
situations and circumstances where he needed the services of an
ASL interpreter and was not provided such services by FCI
Schuylkill officials.[2]  Complainant detailed therapy sessions,
appointments with doctors, large institution-wide meetings,
educational classes and other institution events where
significant, important information was disseminated -- sometimes
large amounts of it -- and he was unable to either comprehend,
understand, or respond.

    This is not to conclude that FCI Schuylkill officials were
entirely unresponsive or cavalier in their responses to

---

[2] The ALJ, in addition to correctly not finding any violation of the Rehabilitation Act when FCI Schuylkill relied on
Joseph's voluntary ASL translation services, also correctly found no violation when institution officials occasionally
asked inmates or non-ASL certified staff members to help communicate with complainant in informal and exigent
circumstances.

5

complainant's communication needs.  There is evidence in the
record that FCI Schuylkill employees and officials made attempts
to bridge communication difficulties by drafting summaries of
meetings, requesting the help of inmates who had some
familiarity with ASL, and postponing certain scheduled events
until an ASL interpreter could be secured.  There was also
credible testimony from institution officials such as Reentry
Affairs Coordinator Suzanne Mitchell, Camp Administrator Ryan
Miller, and Supervisory Contract Specialist Lori Rarig detailing
their attempts to timely obtain ASL interpreters for
complainant.  Their statements detail the efforts made to obtain
interpreters and their frequent failures given the limited pool
of available ASL interpreters in the Schuylkill area and the
need for ASL contractors to pass a security clearance.

      The key conclusion here is that after reviewing the
evidence and taking into account institution efforts such as
summary memos and occasionally successful attempts to hire an
ASL interpreter, there were multiple occasions between August,
2015 and the present when complainant was not provided with an
ASL interpreter.  The record is very clear that complainant,
because of his profound deafness, needs the assistance of an ASL
interpreter to understand and respond to meetings and other
institution programs.  In other words, tracking the statutory
language of §504, solely because of his hearing impairment,
complainant was not and has not been provided an equal
opportunity to participate in FCI Schuylkill's programs.  BOP
officials must remedy this violation by providing complainant
with effective ASL services at all appropriate times and
circumstances.

   B. Emergency Notifications

      Complainant's second discrimination claim charges FCI
Schuylkill officials with not installing alarms which would
provide him with prompt and sufficiently strong alerts in
emergency situations.  Related to this, complainant claimed that
institution officials did not have in place any means to alert
him to institution wide notices, which are generally broadcast
to inmates via loudspeaker.  In making these claims, complainant
asserted that FCI Schuylkill officials violated §504 by not
providing him with suitable warning devices and notices and
thereby left him without the same opportunities as others to be
alerted to emergencies.

P.'S EXHIBIT A - Page 7

The ALJ correctly concluded[3] that considerable evidence in the record established that complainant was well served by existing devices and thus has been provided the same "opportunities" as others.    The administrative record establishes that for emergencies, FCI Schuylkill has installed bright flashing strobe lights and a loud alarm sound that also produce vibrations. Additionally, FCI Schuylkill has housed complainant in a cubicle that is directly below one of the alarms for greater awareness of alarms.    Moreover, the fire alarm system is attached to a sprinkler system which is triggered to spray water into rooms when heat rises to a specified temperature.    Apart from these devices and mechanisms, FCI Schuylkill has established safety procedures for emergencies which require institution officials to locate and evacuate inmates who have failed to report after an alarm is triggered.    Importantly, complainant has not provided a single notable instance where the existing system of alarms and devices compromised his safety or otherwise placed him in jeopardy.    Complainant mentioned one instance when he was in such deep sleep that, even though his bed was very close to the alarms, he did not hear them and had to be woken by a fellow inmate.    That instance, even if it transpired entirely as complainant claims, does not begin to show that he was not well-served by the institution's alarm systems.    The record is clear that after the initial alarm was sounded and strobe lights began flashing, officers would be required to check on inmates who had not reported in response to the alarms and, in cases of fire, the sprinkler system would be triggered should the heat rise to the trigger level.    These additional measure provide reassurance that complainant has not established a §504 violation. Complainant has not provided any evidence that, given the emergency devices and systems that are in operation at FCI Schuylkill, he has been or reasonably could be excluded from "participating" in any emergency response.

Similarly, complainant has failed to provide any evidence that he was not allowed to "participate" in institution notices and announcements because he was unable to hear messages transmitted over the institution's loudspeaker.    There is sufficient evidence in the record establishing that institution-

[3] / CAO does not necessarily share the ALJ's legal conclusion that emergency notifications and institution wide notices are not §504 programs and therefore cannot be the basis for a §504 violation (ALJ Decision, p. 84). The ALJ did not cite any specific authority for this conclusion and based it on the distinction between "necessary appurtenances" to the operation of an institution, which allows no choice or exemption from participation, versus the §504 phrase "programs and activities", which the ALJ viewed as referring to institutional offerings in which inmates may or may not choose to participate. It is not clear that an institution may not be held liable under §504 for not providing programs and activities to persons with disabilities, even those that amount to "necessary appurtenances." But we do not need to reach a firm conclusion on this point because the ALJ did not base his analysis solely on this distinction, and instead, went on to provide a full and fair factual analysis of the issue.

7

wide notifications were not only provided via loudspeaker but
also through an internal computer notification system.   Thus,
complainant had ample opportunity to be aware of institution-
wide notifications.   For those instances when complainant was
being paged by loudspeaker, FCI Schuylkill had in place a
procedure whereby, if complainant (or any other inmate) failed
to respond, a staff member would be asked to personally contact
them.   Complainant admitted to such personal staff contact on
those occasions where he failed to respond to a loudspeaker
notification and acknowledged that he had not received any
discipline or even a negative response for his failure.

     The facts in the record provide no basis to conclude that,
because of the inadequacy of the existing alarm system and
loudspeaker notification practice, complainant has not been
provided an equal opportunity to participate in and respond to
key institution programs.   On this issue, there is no basis for
finding that FCI Schuylkill is in violation §504 of the
Rehabilitation Act.

     C. Telecommunications using Videophone

     Complainant's third claim of discrimination is that FCI
Schuylkill officials, by insisting that he use a TTY system and
by denying his request for a videophone, denied him an equal
opportunity to participate in the institution's telephone
program for inmates.

     BOP institutions, including FCI Schuylkill, have
implemented the Telephone Communications Program (TCP), which
provides inmates with regular opportunities to communicate by
telephone with family and friends outside the institution.   BOP
has explained that the intent in establishing the program is to
provide inmates with opportunities to promote and maintain
community and family ties (see 28 C.F.R. §540.100(a)).   As part
of TCP at FCI Schuylkill, there are four telephones for use by
the inmates, all of them within close proximity to inmate
cubicles.   All inmates are generally eligible to use the phones,
but only to the extent that an inmate is able to pay for usage
through funds earned by working at the institution.   Beyond
needing funds, FCI Schuylkill's rules place specific
restrictions on calls: a limit on total phone minutes per month,
phone calls to be made only during specified blocks of time on a
given day, no more than one call per hour, and a maximum of 15
minutes per phone call.   Within those strictures, inmates are
free to use the phones and do not need the assistance of
correctional staff to access the phones or initiate a call.

Complainant, as a hearing impaired individual, was unable to use the telephones; for him, the institution had in place[4] a TTY (teletypewriter) system.  TTY consists of an electronic keyboard connected to a phone line and it permits real time communication through an exchange of text.  It was developed and implemented in the 1960s and has been continuously in use to the present, although, over the past several years, its popularity has been steadily waning.

Complainant has rejected the institution's offer of TTY use almost from the start of his incarceration and provides many reasons for his position.  Apart from the initial difficulty FCI Schuylkill officials had in locating and setting up a working TTY unit, complainant notes that most of the hearing impaired individuals who make up his family and friends, including his wife, have videophones, having switched from TTY many years ago.  Moreover, complainant further notes, even if his family and friends were to purchase and set up TTY units, he would still not be able to have the same opportunity for phone access enjoyed by other inmates.  Complainant explained that while inmates using telephones could make and receive calls, he would not be able to receive any calls because of the institution's switchboard set-up.  Specifically, the institution's main switchboard operator, who receives every incoming call from outside telephone sources, could not "process" an incoming TTY phone call; the operator picking up the TTY call would hear only silence on the other end and would not know that there was a hearing impaired person wanting to have the call transferred to complainant.  This reality meant that complainant would always need to be the one initiating the telephone calls.

Initiating calls came with its own impediments. At FCI Schuylkill, the TTY unit is set up in an office that is locked when not in use.  For complainant to use the unit, he would first need to locate a Correctional Officer who could open the office and agree to remain nearby until complainant finished his call.  This contrasts with inmates with no hearing limitations who could, within the parameters of TCP, easily and readily make phone calls, with no need for access to a room or permission from a Correctional Officer.

---

[4] / Complainant and Joseph said that institution officials initially had difficulty in locating a TTY keyboard and setting up the TTY system for use. While there may have been some initial problems, the record provides evidence that the FCI Schuylkill has a TTY system (keyboard and transmission unit) in place that is properly wired and set up to permit TTY communication.

P.'S EXHIBIT A - Page 10

Complainant's main problem with TTY is that it is a markedly slow form of communication. TTY requires typing words and composing a message on a keyboard, waiting for the other person to read the message, waiting some more for the other person to type her response and then needing to read the response on his TTY unit. Such a drawn out effort makes for a slow and cumbersome communication. Complainant's experience and impressions of TTY was corroborated with specific data by Director of the Technology Access Program at Gallaudet University Dr. Christian Vogler. Dr. Vogler stated that while communication during routine phone conversation takes place at 180-240 words per minute, TTY communication occurs at about 60 words per minute.

Complainant claimed that Dr. Vogler's expert testimony supports his position that TTY is markedly slower than telephone and supports his claim that FCI Schuylkill, by insisting that he use TTY, was not providing him with equal opportunity to utilize the TCP. Complainant said that he preferred using a videophone because it allows him to communicate using ASL, at a speed far faster than TTY. Complainant noted that according to Dr. Vogler, ASL communication is conducted at about 180 words per minute, almost three times as fast as TTY communication and much closer to the 180-240 words per minute rate of telephone communication. For complainant, given present day technology and the rapid, continuous improvements to it, FCI Schuylkill had a statutory obligation to provide him with videophone access.

FCI Schuylkill officials respond that by providing complainant with full TTY access to communicate with family and friends, they have provided complainant with opportunities to participate in TCP that are equivalent to telephone use.

1. Equal Opportunity to Participate in TCP

The issue to be resolved here is whether FCI Schuylkill officials are in violation of §504 by asserting that TTY is comparable to telephone use for TCP participation purposes and by refusing to provide complainant with videophone access. As noted earlier, courts and the regulations implementing §504 state that there is discrimination if a federal agency conducting a program fails to provide a disabled participant in the program[5] with an equal opportunity to access the agency's

---

[5] The §504 antidiscrimination requirement applies to any program or activity receiving federal financial assistance and to any program or activity conducted by any Executive agency. In analyzing the facts and issues in this case, there may be citations to rulings and statements in court decisions involving not just programs conducted by an

10

programs as the other participants.  Jarvis v. Potter, 500 F.3d 1113, 1120–1121 (10th Cir. 2007); 28 CFR 39.130.  Equal opportunity may be provided through appropriate auxiliary aids which allow a person with a disability to participate in and enjoy the benefits of a program or activity conducted by the agency.  28 CFR 39.160(a)(1).  Auxiliary aids are defined as "services or devices that enable a person with impaired sensory, manual, or speaking skills to have an equal opportunity to participate in, and enjoy the benefits of programs or activities conducted by the agency." 28 CFR 39.103.  In determining which specific aids to provide, "the agency shall give primary consideration to the requests of the handicapped person."  28 CFR 39.160(a)(1),(i).

    The facts in this case, when applied to the statutory non-discrimination requirement, support a finding of discrimination. Key to this conclusion are the §504 implementing regulations requiring FCI Schuylkill to provide complainant with appropriate auxiliary aids so as to afford him an equal opportunity to participate in the TCP program.  The facts establish that TTY does not provide such opportunity.  Inmates who use telephones are able, in their 15 minutes per phone call, to verbally convey news and other information far more rapidly and easily than TTY users, perhaps by a factor of four.  Just as importantly, their voices can convey information not only through words, but through pauses, sighs, and other aural cues.  A voice can also convey, through tone and volume, important emotions and sentiment, and can, considered together, along with the words used, make telephonic communication that is much more meaningful and valuable.  TTY cannot provide this level of communication. While a person with a hearing impairment cannot participate in or be receptive to aural cues, whether it be words or pauses or exclamations, the point here is that it cannot be reasonably claimed that TTY use establishes communication access that is comparable to ordinary telephone use.  Yet this is BOP's position – an insistence that TTY for the hearing-impaired provides sufficient access to the TCP such that it meets the "equal opportunity to access" standard for §504.  But there is no disputing that TTY makes for markedly slower communication than voice conversation and does not allow for any communication other than through text, making for a far more limited communication.  And importantly, it is cumbersome communication; the need to focus on the typing and the need to wait for a response from the other party gives TTY communication a slow,

Executive agency but also to programs receiving federal financial assistance because the essential anti-discrimination principle applies to both.

11

stilted pace, something very different from the fluidity and spontaneity of spoken language through the telephone. Given these differences, it is not reasonable to conclude that complainant, having been limited to TTY use based on an assessment that TTY is adequate, has therefore been provided an equal opportunity to access TCP.

This conclusion questioning the adequacy of TTY for §504 purposes is, of course, dependent on the available alternatives. When TTY was the only practically available technology, the hearing impaired individual had no alternative other than to use TTY. For those times, TTY, with all its limitations, did provide the best available opportunity for the hearing impaired, and was reasonably viewed as providing the hearing impaired with equal access to TCP. But as telecommunications technology has developed, along with marked improvements in digital transmission and computer technology, TTY is no longer the only available means of long distance communication for the hearing impaired. Videophone use is widely accessible, through software on cellphones and laptops and through standalone models. Complainant indicated that nearly everyone in his family has videophones. Developments in telecommunications have been rapidly occurring and, as early as 2013, a federal district court, in considering alternatives to TTY, specifically requested that BOP seriously explore the possibility of videophone communication for hearing impaired inmates. Berke v. Federal Bureau of Prisons, 942 F. Supp. 2d 71 (D.D.C. 2013). Today, almost five years later, given the evidence of the significant differences between telephone and TTY, and given the rapid and continuing development of videophone and other alternate communications technology, there is a persuasive factual basis to conclude that TTY does not provide an equal opportunity to participate in TCP as the telephone.

This was not the conclusion reached by the ALJ in his recommended decision. The ALJ reasoned that although there was ample evidence that "new technologies, including videophone technology, present many benefits over TTY technology, and although the evidence shows that the popularity of TTY equipment has diminished as those technologies have improved", §504 only requires BOP to furnish appropriate auxiliary aids to afford a person with a disability the equal opportunity to participate in institution programs such as TCP (ALJ Rec. Dec., p. 68-69). According to the ALJ, "[c]omplainant has not established that the TTY has fallen so out of favor or that its technology is so obsolete that it per se no longer qualifies as an auxiliary aid which assists in telephone communications." (ALJ Rec. Dec., p.

69).  For these reasons, the ALJ concluded that because FCI
Schuylkill offers TTY, complainant did not establish a §504
violation.

But of course neither the statute nor the regulations
require a showing that TTY is "so obsolete that it *per se* no
longer qualifies as an auxiliary aid." Rather, the regulations
(and the statute) require a showing that complainant is not
being provided an equal opportunity to participate in TCP as
other inmates.  Depending on the circumstances and the operative
facts, equal opportunity may be difficult to assess, but courts
have made clear that equal opportunity is not present when
qualified individuals are not granted "meaningful access" to a
program.  Alexander v. Choate, 469 U.S. 287, 301 (1985); Melton
v. Dallas Area Rapid Transit, 391 F.3d 669, 672 (5th Cir. 2004).
Lack of "meaningful access" is met when there is a showing of an
obstacle that impedes access to a government program or benefit.
American Council of the Blind v. Paulson, 525 F.3d 1256 1267
(D.C. Cir., 2008).  Unless "impedes" is read to mean "completely
prevents", a reading that would be an especially strained
alternative to "meaningful," a marked difference in opportunity
to access and use an agency program provides a firm basis for
finding a §504 violation.  Under the "meaningful access" and
"equal opportunity" standard, TTY cannot provide complainant, an
individual with a profound hearing deficit, meaningful access to
the TCP, not when there are viable alternatives that track more
closely to the access provided to persons with hearing.

The ALJ responds by noting that, although newer
technologies such as videophones "present many benefits over TTY
technology," these improvements do not change the §504
requirement to furnish auxiliary aids only insofar as to afford
a person with a disability an equal opportunity to participate
in a program.[6]  But a reasonable understanding of "equal
opportunity to participate" cannot be that it is met by a
showing of any opportunity to participate, even if it means
minimal participation.  The ALJ's reasoning,[7] if extended, would
permit agencies to provide almost any "opportunity" for
communication to the hearing impaired, confident that it would

---

[6] Such a narrow reading has been viewed as a possible interpretation of §504 and implementing regulations. See
Melton v. Dallas Area Rapid Transit, 391 F.3d 669, 672 fn.2 (5th Cir 2004).
[7] The ALJ also takes into account complainant's refusal to use TTY as a basis for concluding that TTY has not been
shown to be inadequate for §504 purposes. Even without actually using TTY at the institution for any length of
time, given his extensive experiences with hearing devices, complainant has ample basis to know and assert that,
given the availability of significantly better telecommunications alternatives, TTY does not provide him with equal
opportunity to access the TCP.

13

satisfy §504 requirements, regardless of the actual
participation in the program.  But such a pinched interpretation
here would be inconsistent with the anti-discrimination thrust
of §504 and the objectives of the TCP.  TCP was established to
permit, even encourage, inmates to establish contact and
communicate with family and friends because it promotes the
inmates' social and emotional well-being.  The ALJ's
interpretation would essentially undercut these TCP objectives
for complainant by disregarding the quality of his
communication.  Such an interpretation would also require
disregarding marked differences in actual communication
opportunities between hearing and hearing-impaired inmates and
essentially approve of BOP's refusal to consider alternatives.
Such an interpretation, as recognized by the courts, is
inconsistent with the anti-discrimination intent of §504.

     In the same way, the ALJ has no reasonable grounds for
suggesting that complainant's rejection of TTY for videophones
is an attempt to acquire a "popular" or "most advanced"
auxiliary aid.  The ALJ is correct that §504 implementing
regulations do not require BOP to provide the most advanced,
current and/or popular type of auxiliary communication aid but
only that aid which affords the hearing impaired individual an
equal opportunity to participate in BOP's program.  See ALJ Rec.
Dec., p.68-69).  But given the significant limitations of TTY,
and given the speed and greater range for expression and emotion
when using videophones, it is clear that complainant is
requesting the only available device that will allow him to
communicate with a hearing impaired individual in a manner that
has some reasonable semblance to ordinary conversation.

     For all these reasons, the record establishes that BOP, by
insisting that complainant can participate in TCP only by using
TTY, and by refusing to consider videophones as an alternative,
has failed to meet the §504 requirement of providing complainant
with an equal opportunity to participate in TCP.

     2. Fundamental Program Alteration or Undue Burdens

     But this does not end the §504 assessment.  While the
analysis thus far establishes that TTY access does not provide
complainant with an equal opportunity to access TCP, and further
establishes that complainant's preferred device, the videophone,
provides more meaningful communication than TTY, §504
regulations make clear that an agency may nonetheless have
legitimate reasons for not accommodating complainant by using
the preferred device.  28 CFR §39.160 states that the Department

14

must furnish a disabled participant in a federal program with
appropriate communication aids and it further states that:

> [t]his section does not require the agency to take any
> action that it can demonstrate would result in a
> fundamental alteration in the nature of a program or
> activity or in undue financial and administrative burdens.

(28 CFR §39.160(d)). The regulation clarifies that it is the
agency's burden to demonstrate that a specific accommodation
would be a fundamental alteration or undue burden. The
regulations also explain that the agency's burden can be met
only after "considering all agency resources available for use
in the funding and operation of the conducted program or
activity …." 28 CFR §39.160(d).

BOP has provided several, mostly security-based, reasons
for not providing complainant with videophone access. BOP's
reasons and concerns were presented and explained by Mr. Todd
Craig, BOP's Chief of Security Technology. Craig heads the BOP
office that evaluates technology for use within BOP. He said
that, in that capacity, he has had opportunities to consider
videophone use, taking into account safety and security concerns
of the institution and the general public. Craig, in addition
to his technical expertise in matters of institution security,
has an extensive corrections background, having served at
several BOP institutions for many years and in many capacities,
including Warden.

Craig[8] affirmed that for a considerable period of time, BOP
institutions have provided TTY communication for inmates who are
deaf or hard of hearing. Craig said that as new communications
technology have been developed, BOP senior management has asked
his office to consider new devices for deaf or hard of hearing
inmates. Craig indicated that in 2013, after researching and
evaluating the available technologies, his office recommended
VRI[9] for BOP institutions in Butner, North Carolina, and Tucson,
Arizona, and in 2015, updated the recommendation to include VRS[10]

---

[8] Craig's statements were made at the administrative hearing and in an October 20, 2017 Declaration.

[9] Video Remote Interpreter (VRI) is a telecommunication method in which an ASL interpreter in a remote location
is connected by video to a hearing impaired individual (with ASL ability) and a hearing individual who are next to
each other and attempting to communicate. VRI is often utilized to allow a physician to exam or treat a hearing
impaired individual.

[10] Video Relay Service (VRS) refers to a program administered by the FCC, whereby a hearing impaired individual
with ASL capability is able to communicate with a hearing individual in another location by connecting to an
authorized VRS Interpreter. The hearing impaired individual connects to the Interpreter via video and the hearing
individual connects to the Interpreter via phone, and the Interpreter, who is ASL certified, acts as a conduit of

in the Tucson institution, provided that certain security safeguards were implemented.

a.   Monitoring Concerns -- Craig said that while he has considered videophone usage for DHH inmates, he has not recommended them because of security concerns. Craig's concerns included the need to monitor specific videophone communication and the difficulties in having trained staff available for such monitoring. Craig's main source of concern with videophones was the great opportunity to provide information through printed/written words and images. Craig pointed out that in addition to ASL communication, DHH participants in video communications can communicate by showing photographs, drawings, and other visual aids and that such communication could create serious security concerns. By contrast, Craig noted, TTY communication as well as aural telephonic communication allows for more limited communication, and thus easier to monitor.

Monitoring videophones require ASL trained staff and Craig was concerned that institutions would not have staff with such specialized training. He said that (Vol. 5, p. 114):

> We do not have a system that would accommodate the videophones with some of the same safeguards in the inmate telephone system …, such as our staff are not trained in the American Sign Language to monitor or interpret. Those calls, there's no capability outside the one secure VRS solution we implemented at Tucson to record those calls, to monitor those calls both live and historical and use them for investigations.

Craig's concerns are reasonable and legitimate, but for §504 purposes, the focus is whether Craig's concerns establish that the videophone usage would fundamentally alter TCP or result in undue financial or administrative burdens. 28 CFR §39.160(d). In making such an assessment, the regulation requires the taking into account all agency resources.

Craig's concerns do not meet the regulation's "fundamentally alter …or place undue burden" standard. While the concerns are legitimate and serious, there is no showing that the concerns are so unusual or so beyond the security and

---

communication between the hearing person and the hearing impaired person. Although Craig recommended a very limited implementation of VRS technology in a federal institution in Tucson, he seemed to suggest, based on his interchangeable use of the terms VRS and videophone, that notwithstanding the trial introduction of VRS to the Tucson institution, much of his reluctance and caution over the introduction of videophones also applies to VRS technology.

16

monitoring capabilities of institutions so as to meet the high
regulation hurdle. Indeed, Craig even provided statements that
the federal institution at Tucson was adequately monitoring the
recently implemented VRS, giving some basis for the expectation
that the same monitoring can be provided for videophone. Craig
detailed how Tucson officials had set up two separate stations,
one for the staff administering and supervising the VRS usage
and the other for the investigative staff "to review each and
every video call for signs or any kind of attempt to introduce
contraband, exploit another individual on the other end of the
video line or foment criminal activity." (Vol. 5, p. 116).

    Clearly BOP has the capability and capacity to monitor VRS
communication and it has not presented sufficient or specific
evidence to demonstrate that extending this capability and
capacity to videophones would result in undue burdens required
by 28 CFR 29.160. Courts have stressed that the evidence
showing fundamental alteration of program or undue burden must
be detailed and specific (see Timothy v. Cedar Rapids Community
School Dist., 178 F.3d 968, 972 (8th Cir. 199), and BOP has not
presented such detailed, specific evidence. Craig did note that
installing and maintaining Tucson's VRS system requires that
significant funds be spent to buy the equipment, to calibrate it
to existing technology and security requirements and to provide
routine upgrades (Vol. 5, p. 125). Such a statement can
reasonably be interpreted as suggesting that videophones would
likely stress BOP budget even more seriously, but he has not
provided the necessary detail or shown that his conclusion was
reached "after considering all agency resources available." 28
CFR 39.160(d). In the absence of such detailed data, there is
no basis for finding any undue financial burden.

    Craig stressed that from a security perspective, VRS was
less problematic than videophone because VRS communication is
conducted through an FCC approved ASL interpreter. This is a
marked difference from videophones, but from a security
perspective, given the Tucson security arrangements, which
include a separate station for monitoring, it is not clear why
the same arrangement cannot be provided for videophone
communication. Put another way, it is not clear why such
security monitoring by the institution would not meet or be
better than the security constraint provided by an ASL
interpreter. Indeed, when questioned why VRS conversations,
which are recorded, cannot be expanded to permit direct
videophone conversations, Craig allowed that "It's a
possibility" but that that was not "the policy decision of the
agency" (Vol. 5, p. 180). Given this record, BOP has not

17

provided any detailed security reasons for not implementing videophones.[11]

BOP's security concerns are weakened by BOP's acknowledgement that BOP permits telephonic communication by inmates who speak a language other than English or Spanish. Craig noted that most every inmate who can communicate by phone is allowed to participate in TCP. Craig also noted that the general practice in all institutions with TCP is to routinely tape all phone calls and "live" monitor random calls as a security procedure. However, "live" monitoring would not be effective in the case of inmates making calls in a foreign language. Craig confirmed that most institutions allow phone calls by foreign language speakers and in their cases, the institutions tape the call and have the option of sending out the tape to a translator should the need arise.

But this practice raises questions about BOP's emphasis on the need for "real time" monitoring of videophone conversations. Craig did not explain why videophone conversations needed to be monitored "live" but not telephone conversations in a foreign language. In his Declaration, he attempted to distinguish between the two by claiming that the "nature of the direct visual contact" of videophones makes for heightened concerns but provided no specific or persuasive evidence. It is possible that there are unique aspects to ASL communication that mandate closer scrutiny but if so, Craig did not provide such detail.

b.   Complainant's Conviction -- Another concern of Craig's was the matter of complainant's conviction. Craig said that complainant, having been convicted of committing conspiracy to commit mail fraud for fraudulently billing FCC for VRS usage, was a special security risk. Craig argued that complainant's familiarity with VRS and videophone technology and his fraud conviction raised heightened concerns from a security perspective. This is not very persuasive. A fraud conviction coupled with significant awareness of how videophones function does not raise special concerns of videophone abuse. Moreover, if BOP plans to monitor complainant's videophone communication, it is not clear how complainant's background and experience would raise heightened concerns.

---

[11] At the hearing, Craig briefly referenced the need for "stand alone" secure lines to carry and monitor a videophone feed but he did not provide details that would establish fundamental alteration or undue burden.

18

c.  Coercion by fellow Inmates -- Craig also warned that if
complainant were to receive videophone access, he would be
susceptible to harassment, coercion, and general exploitation by
inmates who did not have such access.  This is a very plausible
concern but again, the information provided in support does not
meet the regulatory burden necessary to establish financial or
administrative undue burden.  It is reasonable to assert that
being granted videophone access may subject complainant to
possible coercion by fellow inmates.  Complainant would be the
only, or one of the very few, with videophone access, and it is
conceivable that fellow inmates would pressure him to send
messages on their behalf or to have their relative in attendance
when complainant communicated by videophone with his family.
But inmate coercion matters are well within the corrections
wheelhouse, and Craig has not provided statements detailing how
videophone coercion is meaningfully different as to make for an
undue administrative burden.

d.  DOJ Authorization Needed -- Craig also emphatically
noted that BOP does not have unilateral authority to install a
videophone for inmate usage and that BOP must obtain necessary
authorization from the Department of Justice (DOJ).  Craig
explained that the technical specifications for videophone
currently prevent it from being integrated into the existing
inmate telephone systems at institutions and also noted that
videophones do not conform to DOJ information technology
requirements.  Craig elaborated that (Declaration of Craig, p.
3):

    In order to install a videophone, the BOP would be required
    to request a waiver from DOJ to install the necessary
    digital subscriber line (DSL) and connect to external
    systems without using an approved Trusted Internal
    Connection (TIC).  Upon submission of a waiver request by
    BOP, the approval of the waiver is at the discretion of
    DOJ.

This is a serious administrative matter and will clearly require
diligent coordination of BOP and DOJ authorities.  But
significantly, Craig has not provided any information indicating
that DOJ would reject videophone authorization or would refuse
to approve a BOP waiver to install a DSL line. Rather, Craig has
presented a cautionary statement alerting the reader to
bureaucratic and administrative hurdles that will need to be met
before videophone technology can be implemented.

19

## Decision

In this case, complainant Yeh presented three issues for adjudication. On the issue of ASL Interpreters, this decision finds that FCI Schuylkill must provide ASL interpreters for therapy sessions, doctor's appointments, classes, meetings, and other occasions where significant information is being conveyed to complainant or significant information is needed from complainant. On the issue of emergency notifications, this decision finds that FCI Schuylkill is currently providing complainant with necessary alarms and notifications.

On the issue of videophone use, this decision finds that complainant's current access to TTY does not provide him with equal participation opportunities in TCP. Complainant has requested videophone access and has provided sufficient evidence to establish that videophones will provide him with significantly greater participation opportunities in TCP. This decision further concludes that BOP has not provided evidence that videophone usage will significantly alter TCP or undermine the BOP mission by generating undue administrative or financial hardships. That said, BOP does have legitimate security concerns which, while not meeting the regulatory standard of establishing "fundamental alteration or undue burden," must be taken into account in installing videophone access. If complainant or BOP can identify another device that permits complainant to communicate with a hearing impaired individual using ASL but also provides more of the security safeguards that BOP insists upon, the parties are strongly encouraged to explore the implementation of such a device.

If videophone is the only solution, complainant is cautioned that the actual implementation of videophone use will likely require significant patience and adjustment. BOP has significant responsibilities for assessing the available budget in the present and coming fiscal year, for determining the feasibility of installing dedicated lines at FCI Schuylkill or at another institution, and for coordinating a waiver from authorities at the Department of Justice. These and other attendant matters may take some time.

Robert K. Abraham
Acting Complaint Adjudication Officer

20